[Cite as *In re R.H.*, 2013-Ohio-3763.]

RH
COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
|  | : |  |
| R.H. | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. Patricia A. Delaney, J. |
|  | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 13-CA-29 |
|  | : |  |
|  | : | O P I N I O N |


CHARACTER OF PROCEEDING:    Appeal from the Fairfield County
                            Common Pleas Court, Juvenile
                            Division, Case No. 2011-AB-150


JUDGMENT:                   Affirmed


DATE OF JUDGMENT:           August 22, 2013


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant, A.H.

GREGG MARX                            THOMAS R. ELWING
Prosecuting Attorney                  60 West Columbus Street
                                      Pickerington, OH 43147
By: JOCELYN S. KELLY
Assistant Prosecuting Attorney        For  Andrew Aukerman
Fairfield County, Ohio
239 W. Main Street, Ste. 101          SHERRIE L. HUSTEAD
Lancaster, OH 43130                   33 West Main Street, Suite 103
                                      Newark, OH 43055

Guardian Ad Litem and Attorney for Child

JENNIFER J. HITT
63 North Main Street, Suite B
London, OH 43140

*Baldwin, J.*

{¶1}    Appellant A.H. appeals from the February 20, 2013  Entry of the Fairfield County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody  of R.H. to Fairfield County Child Protective Services.

STATEMENT OF THE FACTS AND CASE

{¶2}    R.H. (DOB 2/25/11) is the biological child of appellant A.H.  His paternity has not been established.  R.H. was removed from appellant's custody when he was less than one month old.

{¶3}    On July 21, 2011, a complaint was filed alleging that R.H. was a dependent child.  Pursuant to an Entry filed the same date, the child was placed in the temporary shelter custody of Fairfield County Child Protective Services (FCCPS).

{¶4}    On September 14, 2011, R.H. was found to be a dependent child and was placed in the temporary custody of FCCPS.   Thereafter, on November 17, 2011, FCCPS filed a motion for permanent custody of R.H. A hearing on such motion commenced on October 15, 2012.

{¶5}    At the hearing, appellant, who was 19 years old at the time, testified on cross-examination that she was not married to R.H.'s father, who she alleged was Andrew Aukerman, and that paternity had not been established because he refused. She testified that she lived with her mother, step-sister, her step-sister's fiancé and her uncle and that she paid rent.  Appellant testified that her step-sister had a criminal record for drug usage, but that she was not using drugs anymore. Appellant's step-sister and her fiancé both refused to submit to screens for drugs or alcohol and

appellant testified that she and her mother were working on finding a different place for appellant to live with R.H.

{¶6}     Appellant testified that in February of 2012, she was involved in a physical altercation with her brother Michael. As a result, appellant obtained a protection order. Appellant still saw her brother and testified that she had seen him several times since the incident.  Appellant also testified that since FCCPS had taken custody of R.H., she had moved twice. She had never lived on her own, but indicated that she was planning on moving into an apartment with her 37 year old fiancé, Shane.  She met Shane when she was 12 years old and Shane was married.  When asked who provided for her basic needs, appellant testified that sometimes she did and sometimes her mother did. Appellant, who had never finished high school and was hoping to get her GED, gets social security and her mother is the payee.  Appellant testified that she quit high school three weeks before the end of her senior year. Appellant testified that she did not have a job, but that she intended to apply for jobs once she got R.H. back and got an apartment.  Appellant does not have a driver's license and her reading ability is limited.

{¶7}     At the hearing, appellant testified that her father was in prison and was due to be released in January of 2013.  She indicated that he was going to live with appellant and her mother upon his release. According to appellant, her father beat her and was abusive to her when she was younger.  She also testified that he had sexually abused her and denied it and that he had sold her body to other men for money. When asked, she stated that the abuse started when she was 10 years old and stopped when her father went to jail when she was 16 years old.  Appellant believed that her father

had learned his lesson and that she could protect herself against him. She believed that her father would not do anything to his grandchildren, only to his two daughters.

{¶8} Appellant agreed the she had problems with anger, but testified that she no longer did because she was on medication that kept her calm. She testified that she had not had any regular counseling since June of 2012. When asked why R.H. was removed from her, she testified as follows:

{¶9} So (inaudible) because of my injury and people calling in saying that I was beating him and I wasn't and, uh, my best friend's mom made a statement saying that I said it, saying I wish I never had a baby. I was drugged up at the time; I was on Percocets at the time to get me healed up, what, what the doctors fed me and Mama Jo said when I said it I was half asleep and half awake when I said it, but she did not tell Children Services that I was half awake and half asleep.

{¶10} Q.    So you did say it?

{¶11} A.    I don't remember.

{¶12} Q.    Oh, okay, But you think if you did say it, you were drugged up?

{¶13} A.    Yeah.

{¶14} Transcript from October 16, 2012 at 51-52.

{¶15} Appellant was asked about her case plan. She testified that she was required to undergo counseling and anger management and to complete parenting classes. She testified that her caseworker, Nikki DeLeon, had helped her with transportation and had given her a gas voucher for her visits with R.H.. Appellant testified that she had a certificate for passing parenting classes. Appellant also testified that in addition to Shane, she had had a boyfriend recently named David who was 36

years old. She testified that she was with David, who she knew was married, for about a month or two and then he went back to his wife who appellant claims threw her in jail. Appellant miscarried David's child.

{¶16} Appellant admitted that she went to Zanesville with an older man who she met at the laundromat and got her lip pierced. She admitted that she did not know anything about him including his last name or where he worked. When questioned, appellant conceded that she should not have gotten into a car with someone who she did not know well because it was unsafe, but stated that she did not realize that at the time. Appellant also testified that her cousin took pictures of her in her bathing suit posing on a motorcycle at a motorcycle shop. She indicated that she volunteered because she was the only girl there. Appellant reported to FCCPS that this was a job. Appellant also testified as to a physical incident the week before at the fair involving an ex-boyfriend. She stated that another ex-boyfriend beat this ex-boyfriend up and that she was afraid for her safety.

{¶17} Appellant testified that she visited with R.H. every Tuesday for an hour and was consistent with her visits. Appellant's mother was always with her. She admitted that there had been times when she had been on her cell phone during the visits. Appellant stated that she did not know R.H.'s sleep schedule and could not identify what sorts of food were healthy for a toddler.

{¶18} On direct examination, appellant testified that while her bedroom was cluttered in a photograph taken on October 1, 2012 by Nikki DeLeon, her bedroom did not look the same at the time of the hearing and that R.H. was never in her room when it was in that condition. She testified that if R.H. were to live with her, she would not

allow anyone on drugs around him and would not allow anyone who might hurt him near him.  She indicated that if she got her own place, she would support herself using social security and food stamps. Appellant indicated that the first time she took parenting classes, she did not pass but that she had passed the second time.  She further testified that if she was told that it was not safe for her son to be around her father, she would not let her father come and visit.

{¶19}   Appellant was questioned about why she stopped counseling with Mike Selegue from Mid-Ohio Psychological Services.  She indicated that she stopped counseling with him because he made her upset when he told Children's Services that appellant was not capable of taking care of R.H.   She wanted to find a different counselor who was more helpful, but could not remember the counselor's name that she was seeing. Appellant indicated that she had only gone once and had accidently missed an appointment, but intended to get back to counseling.

{¶20}   Appellant also testified that Children's Services had not seen Shane's place and that Shane lived with his parents in the garage. The two had been back together for approximately three weeks.

{¶21}   Leah Miller, an early Head Start home visitor, testified that she had been working with appellant for a little over a year and saw appellant every week during her supervised visits, which lasted approximately an hour and a half to two hours.  Miller testified that appellant was bonded with her son and that she loved him. Appellant had expressed to her early on that she sometimes had trouble with anger.  Miller testified that she worked with appellant on determining what foods were nutritious and appropriate for R.H. and that she helped appellant with better ways of talking to her

mother other than snapping.  According to Miller, appellant struggled with interacting with R.H. the entire time of the visits and had trouble retaining information. Miller testified that she had never seen appellant angry at R.H., only with her mother.  When asked if she would have any concerns for R.H.'s safety if he was returned to appellant's care, Miller testified that she would because appellant did not have the experience of caring for him full-time.  She further testified that she did not believe that appellant had a real strong support system because there were issues with her brother and appellant and her mother fought often.  Miller stated that appellant told her that she had her ups and downs with Shane and that the two recently split, that appellant then had another boyfriend who she said she was engaged to, and then appellant was back with Shane. Miller believed that appellant was unable to meet R.H.'s basic daily needs and often put herself in unsafe situations.  She stated that she believed that appellant did not make good choices in terms of who to surround herself with.

{¶22}   The next witness to testify was Mike Selegue, a community mental health social worker with Mid-Ohio Psychological Services.  He testified that he started working with appellant in March of 2011 and that their interaction ended in September of 2011. He testified that he was working with appellant to improve her parenting skills and that he first saw appellant every week and then every other week.

{¶23}   Nikki DeLeon, appellant's caseworker with FCCPS, testified that the case had been assigned to her in March of 2011. She testified that R.H. was 22 months old. According to DeLeon, the agency initially filed a complaint for temporary custody on March 22, 2011 and  R.H. was placed in the agency's temporary custody on the same date. The complaint was then dismissed on May 17, 2011 and refiled on July 21, 2011.

R.H. was placed in the shelter care custody of the agency on such date. She further testified that he had been in the temporary custody of the agency since September 14, 2011 and had been in same foster home the entire time.

{¶24}    DeLeon testified that appellant's case plan initially included her mother until appellant turned 18 years old. According to DeLeon, the case plan had three objectives: (1) to address mental health,  behavioral health and cognitive ability, (2) to address appropriate housing, independent living skills and economic stability and (3) to address parenting abilities.    When the agency first received concerns in February of 2011, cognitive ability was cited as a concern as well as appellant's mental and emotional health. The agency recommended that appellant participate in individual mental health therapy and engage in only healthy and safe relationships. The agency encouraged her to continue with Mike Selegue with Mid-Ohio. DeLeon testified that when appellant stopped working with him in September of 2011, the agency was not satisfied that appellant did not need additional counseling.  Because appellant moved from Lancaster to New Lexington, a new mental health agency was needed because appellant was in a different area. DeLeon testified that appellant and her mother retained Perry County Counseling on their own and that the counselor there saw appellant through the beginning of 2012.  Appellant then moved back into Fairfield County in June of 2012 and was referred to New Horizons for counseling.  Appellant had an intake appointment at New Horizons in August of 2012 and had one appointment on September 6, 2012.  She had another appointment scheduled for September 12, 2012 that she failed to attend. Appellant had not called to schedule any other appointments.

{¶25} When asked what issues she wanted appellant to address through counseling, DeLeon testified, in relevant part, as follows:

{¶26} A.        Um, we are concerned with [appellant's] ability, first and foremost, to keep herself safe and the people that she, um, has around her and in her home, um, she has suffered substantial abuse and trauma over the course of her life and we want to insure that, um, maybe through mental health counseling she can develop some skills to, to protect herself in the future.  Um, in addition to just coping with daily stressors, um, and her separation from her son, her relationship with her mother, the anger issues that were referenced earlier, those have been ongoing, um, concerns throughout the life of the case, um, but those are the main concerns.

{¶27} Transcript of October 16, 2012 hearing at 273.

{¶28} Although appellant had had at least four counselors throughout the case, the agency still had concerns with her ability to keep herself safe due to appellant's volatile relationships, including with Shane Earhart, who appellant alleged was verbally abusive.  DeLeon noted that appellant had relationships with men who were much older than her and that appellant brought a man to the agency to meet DeLeon, but did not know his last name even though he was living with her. According to DeLeon, that relationship lasted for about one month and ended after appellant broke up with the man, who was married, because he punched her in the stomach, causing her to miscarry.

{¶29} DeLeon also indicated that the agency was concerned about appellant's relationship with her older brother, Michael.  The two had frequent physical altercations, but Michael was allowed to be in appellant's home and sometimes resided there.

DeLeon testified that although appellant acknowledged the physical and sexual abuse that she endured as a minor while in the care of her father, appellant and her mother stated that they were going to allow him to return home upon his release from prison. According to DeLeon, appellant did not recognize unsafe situations until it was too late and failed to prevent the same from happening. She testified that the agency had the same concerns at the time of the hearing as they did when the original complaint was filed and that the concerns were greater. She indicated that there had been improvement in appellant's anger issues although she had recently observed appellant snap at her mother. DeLeon believed that appellant still had anger issues to be addressed through mental health counseling. She indicated that appellant had not successfully complied with the aspect of her case plan that addressed mental health issues and the ability to keep herself safe.

{¶30} When asked if she had concerns about appellant being able to meet her own basic needs and those of R.H., DeLeon stated that she did because appellant relied heavily on her mother for assistance with food, shelter, transportation and clothing. According to her, appellant's bedroom was often cluttered and contained mattresses without sheets or covers. Appellant also had problems with personal hygiene and was easily distracted and had a hard time focusing on her child. DeLeon testified that appellant had not complied with the aspect of her case plan that required her to provide for her own basic needs. She further testified that appellant had not attended school on a regular basis and that appellant told her that she did not want services through Fairfield County Board of Developmental Disabilities unless they could help her pay for an apartment. Appellant had not been involved in any type of formal

schooling for six or seven months. DeLeon testified that appellant enrolled in school in the fall of 2012 and that she did not continue attending. DeLeon stated that appellant had a relatively stable source of income from her social security, but expressed concern that appellant wanted to change her payee to "someone that she's with in the moment." Transcript of October 16, 2012 hearing at 310. She stated that she believed that appellant did not intend to live independently, but to move in with Shane and rely on him for support.

{¶31} DeLeon also agreed that that she was concerned about the people who resided in appellant's house who refused to provide background information or to submit to drug and alcohol screens. For such reason, the agency would not consider placing R.H. in the house. She testified that she did not believe that appellant had complied with that part of her case plan that addressed housing, independent living skills and economic stability.

{¶32} The hearing resumed January 17, 2013. Appellant had gotten married to Shane since the October 2012 hearing and was enrolled to return to high school. At the January 2013 hearing, appellant testified that she was 19, married and that she and her husband, Shane, were trying to get out of the house. Appellant testified that she was living with her mother and husband and that no one else was living with them. She testified that R.H. would have his own bedroom in the apartment and that the apartment was clean. She further testified that she was working on getting the protection order against her brother, Michael, dropped and that she sometimes saw him. Appellant testified that Michael went with her to Taco Bell to help her fill out a job application because she had problems with reading. Appellant further testified that Michael had

been in jail and that she and her husband gave his girlfriend $100.00 to bail him out. Appellant indicated that they were thinking about moving to Mississippi once everything had cooled down. While appellant does not have family there, Shane does.

{¶33}   Appellant testified that she was kicked out of home schooling and that she was enrolled to start Lancaster High School on the following Tuesday. She hoped to graduate in June of 2013.  Appellant testified that she did not have a job, but that Shane did and had worked at his job awhile.  According to appellant, her social security had stopped because she got married and she was in the process of getting it back. Money was tight and appellant and her husband did not have a refrigerator until two months prior, only a cooler. Appellant agreed that recently, her mother had to pay for diapers and wipes for R.H.  to be used during visits.  She further testified that the Board of Developmental Disabilities told her that she was not eligible for services and that she called and they did not return her calls. She also testified that her father was getting out of prison soon and that if R.H. was not in the home, her father was moving back in with her mother and she was going to move out.

{¶34}   Appellant stated that she was on anger medication and a sleeping pill. She testified that she had not heard any voices lately, but had heard voices about two months earlier. The voices told her to "Get out of the house." Transcript of January 17, 2013 hearing at 49. Appellant also had hallucinations and had in the past had blackouts. She testified that she was trying to get pregnant, but agreed that it was not a good idea. Appellant also testified that she had been sexually assaulted the first week of January of 2013 by her cousin, but did not make a police report even though her mother and husband told her to. She agreed that she did not discuss the rape with her mental

health counselor even though Nikki DeLeon told her that she should. Appellant, who had physical problems from the rape, had not gone to a doctor. Nor did appellant report to anyone that she had concerns about the children that were living in her cousin's house. When asked why she did not leave her cousin's house immediately after the incident, appellant testified that she did not because her mother did not have the gas to make the trip.

{¶35} Nikki DeLeon resumed her testimony on January 17, 2013. She testified that appellant had continued her sessions with Wendy Shackelford, her mental health counselor, at New Horizons since the last hearing, but had missed three sessions for lack of transportation. DeLeon testified that she referred appellant to the agency's transportation department and gave her information on resources. DeLeon was concerned that appellant had not discussed the recent rape allegation with her mental health counselor and questioned the benefits that appellant received from the counseling. She noted that appellant had been informed that her cousin was a registered sex offender, and that she decided to go to his house anyway. According to DeLeon, appellant alleged that she was present with a 12 year old child and stated that she believed that the child was raped as well, but had not reported the rape. The agency was still concerned about the choices that appellant made regarding her brother who had a history with the agency as well as criminal and substance abuse histories. DeLeon was concerned that appellant could not protect R.H. if she could not protect herself and that she would not get him medical treatment.

{¶36} DeLeon also noted that just a month to six weeks prior to her marriage, appellant was seeing another man. She voiced concerns over appellant's attempts to

get pregnant and plan to move to Mississippi as well as the fact that appellant reported hearing voices and having hallucinations during a case review in November. DeLeon remained of the opinion that appellant had not successfully complied with her case plan. The agency was still concerned about the choices that appellant made, with appellant maintaining her safety and about appellant's anger. Appellant, according to DeLeon, had not successfully completed her mental health counseling.

{¶37} DeLeon also noted that appellant lacked sufficient food on numerous occasions and that she drove appellant to the food pantry to get food. She questioned whether appellant and her husband would be able to manage their funds and maintain an apartment.

{¶38} DeLeon testified that she had investigated other family members for placement and that none had been appropriate. She testified that R.H. had been in the same foster home since March of 2011 and that while appellant had bonded with R.H., he had not bonded with her. There was no bond between R.H. and Shane, appellant's husband. R.H., according to her, had bonded with his foster parents and was doing well. She stated that he needed a legally secure placement and could not get the same with appellant. The following testimony was adduced when she was asked why:

{¶39} "A.    Though [appellant] has made some efforts to engage in services, um, insufficient progress has been made overall. Um, she does not possess the cognitive abilities or emotional stability to ensure [R.H's] safety and well-being independently. She, herself, has been the victim of neglect and sexual abuse as a minor, um, as well as sexual abuse as an adult. She's engaged in several relationships since the Agency's involvement which could have put the child in her care at significant

risk for similar trauma. Um, maternal grandmother, who is [appellant's] primary support, also has cognitive delays and history of instability, as well as involvement with this Agency. Throughout this Agency's involvement, both [appellant and her mother] have continued to engage in relationships with individuals who put their health and safety at risk. Neither [appellant or her mother] have shown evidence of an ability to identify safe individuals and/or situations. Though [appellant] is now married to Mr. Arehart, over the course of the Agency's involvement, this relationship has been inconsistent with many reports up until recently for both [appellant] and maternal grandmother that Mr. Arehart is verbally abusive. It is not known if Mr. Arehart has the ability to provide the guidance necessary to insure [appellant] remains safe herself and impossible to predict, um, his ability in the future to insure the safety and well-being of a child if in her care."

{¶40}   Transcript of January 17, 2013 hearing at 110-111.

{¶41}   She stated that the only way that R.H. could achieve a legally secure permanent placement was through the granting of permanent custody to the agency and that it was in R.H.'s best interest for permanent custody to be granted to the agency. Appellant had moved four times since the duration of the case.

{¶42}   The Guardian ad Litem recommended that permanent custody be granted to the agency.

{¶43}   Pursuant to a February 20, 2013 Entry, the trial court terminated appellant's parental rights and granted permanent custody of R.H. to FCCPS. The trial court, in its Findings of Fact and Conclusions of Law, found, in part, that R.H. could not and should not be placed with appellant within a reasonable time and that it would be in R.H.'s best interest if permanent custody was granted to the agency.

{¶44} Appellant now raises the following assignments of error on appeal:

{¶45} THE TRIAL COURT'S FINDING THAT PERMANENT CUSTODY SHOULD BE AWARDED TO FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES PURSUANT TO R.C. 2151.414 (D) & (E) WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

I

{¶46} Appellant, in her sole assignment of error, argues that the trial court's award of permanent custody to FCCPS was not supported by clear and convincing evidence. We disagree.

{¶47} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries,* 5th Dist. Stark No. CA–5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶48} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 1997–Ohio–260, 674 N.E.2d 1159.

{¶49} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶50} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period.

{¶51} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need

for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶52} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶53} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R .C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶54} The trial court determined, in part, that the child could not be placed with appellant within a reasonable time pursuant to R.C. 2151.414(E)(1), which requires the following findings:

{¶55} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall

consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

{¶56} A review of the record, as well as the trial court's lengthy and detailed findings of fact, supports the trial court's decision that R.H. could not and should not be placed with appellant within a reasonable time. As is stated above, testimony was adduced that appellant has a history of unsafe choices and repeatedly placed herself in dangerous situations. She quit high school three weeks before she would have graduated and had not obtained employment. As noted by the trial court, she had not made any progress on her education from the Spring of 2012 to January of 2013.

{¶57} In addition, appellant has failed to maintain suitable and stable housing. Since March of 2011, she has resided in four different residences. Testimony was adduced that the room where R.H. would live was extremely cluttered and would be unsafe for R.H. Appellant relied on her mother for food, clothing, transportation and housing and had been unable to meet her own basic needs as required by her case plan. Appellant often was unable to buy diapers or wipes for use during visits with her son, and sometimes lacked food in the house. Appellant herself testified that at times she did not have a refrigerator.

{¶58} In addition, testimony was adduced that the agency still was concerned about appellant's parenting skills. As is stated above, Leah Miller testified that appellant had trouble focusing on R.H. during their visits. Appellant also testified that she did not know her son's sleep schedule and she had trouble stating what types of food were

healthy for him.  Moreover, testimony was adduced that appellant had issues with anger and has not complied with mental health counseling. As noted by appellee, between August of 2012 and mid-October of 2012, appellant had an intake appointment at New Horizons and one counseling appointment there. Appellant, at the January 17, 2013 hearing, did not know the last name of her counselor at New Horizons and testified that while she was to see her counselor every two weeks, she had seen her counselor four (4) times and had missed three (3) appointments between October of 2012 and January of 2013.  Appellant testified that she did not report the alleged rape by her cousin to her counselor.

{¶59}   In short, we find that the trial court did not err in finding that R.H. could not and should not be placed with appellant within a reasonable time.

{¶60}   We further find that the trial court did not err in finding that it was in R.H.'s best interest for permanent custody to be granted to the agency. Testimony was adduced that R.H. is not bonded with appellant or with her husband, but was bonded to his foster parents. No other family members were appropriate for placement.  In addition, testimony was adduced that R.H. had been in the agency's custody since September of 2011 and needed a legally secure placement that he could not achieve with appellant. We note that the Guardian ad Litem recommended that permanent custody be granted to the agency.

{¶61}   Based on the foregoing, appellant's sole assignment of error is overruled.

{¶62}   Accordingly, the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is affirmed.


By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.


_____
HON. CRAIG R. BALDWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. PATRICIA A. DELANEY


CRB/dr

[Cite as *In re R.H.*, 2013-Ohio-3763.]

IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF:              :
                              :
          R.H.                :
                              :
                              :          JUDGMENT ENTRY
                              :
    :                         :
                              :
                              :          CASE NO. 13-CA-29

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Fairfield County, Juvenile Division is affirmed. Costs assessed to appellant.


_____
HON. CRAIG R. BALDWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. PATRICIA A. DELANEY